Robert & Donna Cain
3155 Old Mill Rd.
Brandenburg, Ky.40108
( 270 ) 284 – 4025 / rm1cain@gmail.com

FILED US
US DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

10 OCT -5 PM 2: 13

# UNITED STATES DISTRICT COURT

## KENTUCKY WESTERN DISTRICT COURT

Case # 3:10 - CV- 632 -C

**ROBERT CAIN**

Plaintiff,

**ORIGINAL PETITION**

vs.

**AMERICAN HOME MORTGAGE SERVICING**

Defendant

Date: _____

Comes now  Robert  Cain , hereinafter referred to as "Petitioner," and moves the court for relief as herein requested:

### PARTIES

Petitioner is  Robert  Cain ,  3155 Old Mill Road  Brandenburg  KY 40108.  Currently Known Defendant(s) are/is:  American Home Mortgage Services ,  PO BOX 619063 ,  TX  75261, by and through its attorney .

### STATEMENT OF CAUSE

Petitioner, entered into a consumer contract for the refinance of a primary residence located at 3155 Old Mill Road  Brandenburg  KY 40108, hereinafter referred to as the "property."

Defendants, acting in concert and collusion with others, induced Petitioner to enter into a predatory loan agreement with Defendant.

Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully crafted scheme intended to defraud Petitioner.

Defendants failed to make proper notices to Petitioner that would have given Petitioner warning of the types of tactics used by Defendants to defraud Petitioner.

Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION                                        1 of 25

23   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
24   induce said agents to breach their fiduciary duty to Petitioner.

25   Defendant's attorney caused to be initiated collection procedures, knowing said collection
26   procedures in the instant action were frivolous as lender is estopped from collection procedures,
27   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
28   the production of the original promissory note alleged to create a debt.

29                                     **IN BRIEF**
30                          *(Non-factual Statement of Posture and Position)*

31   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
32   making a number of allegations that, outside the context of the current condition of the real
33   estate industry, may seem somewhat outrageous and counter-intuitive.

34   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
35   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
36   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
37   people, just doing what they have been trained to do, are out to swindle the poor
38   unsuspecting borrower.

39   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
40   committed by people acting in concert and collusion, one with the other.  Petitioner has no
41   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
42   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
43   and they, at the very least, kept themselves negligently uninformed of the wrongs they
44   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
45   courts, for failure to strictly enforce the consumer protection laws.

46                      **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
47                          *(General State of the Real Estate Industry)*

48   ***THE BEST OF INTENTIONS***

49   Prior to the 1980's and 1990's ample government protections were in place to protect
50   <u>consumers</u> and the lending industry from precisely the disaster we now experience.
51   <u>During</u> President Clinton's administration, under the guise of making housing available to

ORIGINAL PETITION                                           2 of 25

52   the poor, primary protections were relaxed which had the effect of releasing the
53   unscrupulous on the unwary.

54   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
55   the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
56   With the protections removed, the unscrupulous lenders swooped in and, instead of
57   making loans available to the poor, used the opportunity to convince the unsophisticated
58   American public to do something that had been traditionally taboo; home buyers were
59   convinced to speculate with their homes, their most important investment.

60    American Home Mortgage Services , Ameriquest, Countrywide, and many others
61   swooped in and convinced Americans to sell their homes, get out of their safe mortgage
62   agreements, and speculate with the equity they had gained by purchasing homes they could
63   not afford.  Lenders created loans intended to fail as, under the newly crafted system, the
64   Lender profited more from a mortgage default than from a stable loan.

65   Companies cropped up who called themselves banks when, in fact, they were only either
66   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
67   creating and selling promissory notes.  As will be demonstrated, these companies then
68   profited from the failure of the underlying loans.

69   ***HOW IT WORKS***

70   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
71   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
72   investor.

73   People would set up mortgage companies by securing a large loan from one of the major
74   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
75   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
76   lender who would secure the title from the seller using the borrowed bank funds for that
77   purpose, and then trade the title to the buyer in exchange for a promissory note.

78   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
79   6 months.  As soon as the closing is consummated, the promissory note is sold to an
80   investor pool.

81   Using the instant case as an example, a 109,800.00 note at 8.9160%  interest over 30 years
82   will produce $127,999.31  The lender can then offer to the investor the security instrument

ORIGINAL PETITION                                                      3 of 25

83    (promissory note) at say 50% of it's future value.  The investor will, over the life of the

84    note, less approximately 3.00% servicing fees, realize $155,738.53 .  The lender can then

85    pay back the bank and retain a handsome profit in the amount of $55,571.84.  The lender,

86    however, is not done with the deal.

87    The lender signed over the promissory note to the investor at the time of the trade, <u>but</u> did

88    not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme

89    Court addressed this issue and stated that such a transaction was certainly legal.  However,

90    it created a fatal flaw as the holder of the lien document, at time of sale of the security

91    instrument, received consideration in excess of the lien amount.  Since the lien holder

92    received consideration, he could not be harmed.   Therefore the lien became an

93    unenforceable document.

94    This begs <u>the</u> question: if keeping the lien would render it void, why would the lender not

95    simply transfer the lien with the promissory note?  The <u>reason is because the</u> lender will

96    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

97    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax

98    liability.  The lender, by this maneuver, gets consideration a second time.  And still the

99    lender is not done profiting from the deal.

100    After sale of the promissory note, the lender remains as the servicer for the investor.  The

101    lender will receive 3% of each payment the lender collects and renders to the investor

102    pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep

103    that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the

104    foreclosure.

105    The lender stands to profit more from a note that is overly expensive, than from a good

106    stable loan.   And where, you may ask, does all this profit come from?  It comes from the

107    equity the borrower had built up in the home.  And still the lender is not finished profiting

108    from the deal.

109    <u>Another nail was driven in the American financial coffin when on the last day Congress</u>

110    <u>was in session in 2000 when restrictions that had been in place since the economic</u>

111    <u>collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks</u>

112    <u>without actually buying them.  This unbridled speculation led directly to an economic</u>

113    <u>collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the</u>

114    <u>unscrupulous lenders got their way on the last day of the congressional session.  Congress</u>

115    removed the restriction banning derivatives and again allowed the practice, this time
116    taking only 8 years to crash the stock market.   This practice allowed the lender to profit
117    further from the loan by betting on the failure of the security instrument he had just sold to
118    the unwary investor, thus furthering the purpose of the lender to profit from both the
119    borrower (consumer) and the investor.

120    The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
121    bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
122    accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
123    were acting under the guise of government regulation and, therefore, the borrower had
124    reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
125    protect the consumer from just this kind of abuse were simply being ignored.

126    The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
127    the referral of the client to the lender by a person acting as an agent for the borrower.
128    Hereinafter, the person or entity who receives any portion of the yield spread premium, or
129    a commission of any kind consequent to securing the loan agreement through from the
130    borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
131    law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
132    seeking out a lender for the borrower, would seek the best deal for his client rather than
133    who would pay him the most.  That was the intent, but not the reality.  The reality is that
134    Agents never come away from the table with less than 2% or 3% of the principal.  This is
135    accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
136    fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
137    product than the borrower qualifies for.  This will generate more profits for the lender and,
138    consequently, for the Agent.

139    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
140    the fair market price.  This allows the lender to increase the cost of the loan product and
141    give the impression that the borrower is justified in making the purchase.

142    The lender then charges the borrower an underwriting fee in order to convince the
143    borrower that someone with knowledge has gone over the conditions of the note and
144    certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
145    deception of the borrower by placing undue stress on the borrower to sign the large stack
146    of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

147  insure the transaction.  This trust is systematically violated for the purpose of taking unfair
148  advantage of the borrower.   The entire loan process is a carefully crafted contrive
149  connivance designed and intended to induce the unsophisticated borrower into accepting a
150  loan product that is beyond the borrowers means to repay.  With all this, it should be a
151  surprise to no one that this country is having a real estate crisis.

152  **PETITIONER WILL PROVE THE FOLLOWING**
153  Petitioner is prepared to prove, by a preponderance of evidence that:

154  - Lender has no legal standing to bring collection or foreclosure claims against the
155    property;

156  - Lender is not a real party in interest in any contract which can claim a collateral
157    interest in the property;

158  - even if Lender were to prove up a contract to which Lender had standing to enforce
159    against Petitioner, no valid lien exists which would give Lender a claim against the
160    property;

161  - even if Lender were to prove up a contract to which Lender had standing to enforce
162    against Petitioner,  said contract was fraudulent in its creation as endorsement was
163    secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
164    the inducement, fraud in the execution, usury, and breaches of contractual and
165    fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
166    Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
167    Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
168    "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
169    'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
170    bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
171    pooled together in a trust fund;

172  - Defendants have concocted a carefully crafted connivance wherein Lender
173    conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
174    by inducing Plaintiff to enter into a predatory loan inflated loan product;

175  - Lender received unjust enrichment in the amount of 5% of each payment made late
176    to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION

177  • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
178     handling the foreclosure process on a contract Lender designed to have a high
179     probability of default;

180  • Lender intended to defraud Investor by converting the promissory note into a
181     security instrument and selling same to Investor;

182  • Lender intended to defraud Investor and the taxpayers of the United States by
183     withholding the lien document from the sale of the promissory note in order that
184     Lender could then hold the lien for three years, then prepare and file Internal
185     Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
186     and deduct same from Lender's income tax obligation;

187  • Lender defrauded backers of derivatives by betting on the failure of the promissory
188     note the lender designed to default;

189  • participant Defendants, et al, in the securitization scheme described herein have
190     devised business plans to reap millions of dollars in profits at the expense of
191     Petitioner and others similarly situated.

## PETITIONER SEEKS REMEDY

193  In addition to seeking compensatory, consequential and other damages, Petitioner seeks
194  declaratory relief as to what (if any) party, entity or individual or group thereof is the
195  owner of the promissory note executed at the time of the loan closing, and whether the
196  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
197  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
198  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

### *PETITIONER HAS BEEN HARMED*

200  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

201  Such harm and detriment includes economic and non-economic damages, and injuries to
202  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

203  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
204  equitable relief requested herein is granted.

ORIGINAL PETITION                                         7 of 25

205                                    **STATEMENT OF CLAIM**

206        *DEFENDANTS LACK STANDING*

207             **No evidence of Contractual Obligation**

208    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
209    produce said contract. Even if Defendants produced evidence of the existence of said contract in
210    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
211    that a contract actually existed at one point in time. A copy, considering the present state of
212    technology, could be easily altered. As Lender only created one original and that original was
213    left in the custody of Lender, it was imperative that Lender protect said instrument.

214    In as much as the Lender is required to present the original on demand of Petitioner, there can be
215    no presumption of regularity when the original is not so produced. In as much as Lender has
216    refused Petitioner's request of the chain of custody of the security instrument in question by
217    refusing to identify all current and past real parties in interest, there is no way to follow said
218    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
219    the contract have been made. Therefore, the alleged copy of the original is only hearsay
220    evidence that an original document at one time existed. Petitioner maintains that, absent
221    production of admissible evidence of a contractual obligation on the part of Petitioner,
222    Defendants are without standing to invoke the subject matter jurisdiction of the court.

223             **No Proper Evidence of Agency**

224    Defendants claim agency to represent the principal in a contractual agreement involving
225    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
226    pronouncement that agency has been assigned by some person, the true identity and capacity of
227    whom has not been established. Defendants can hardly claim to be agents of a principal then
228    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
229    no attempt to provide admissible evidence from the principal.

230    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
231    court.

ORIGINAL PETITION                                                    8 of 25

232         **Special Purpose Vehicle**

233     Since the entity now claiming agency to represent the holder of the security instrument is not the

234     original lender, Petitioner has reason to believe that the promissory note, upon consummation of

235     the contract, was converted to a security and sold into a special purpose vehicle and now resides

236     in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue

237     Code and as such, cannot be removed from the REMIC as such would be a prohibited

238     transaction.     If the mortgage was part of a special purpose vehicle and was removed on

239     consideration of foreclosure, the real party in interest would necessarily be the trustee of the

240     special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a

241     special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

242     cause to believe defendant is not the proper agent of the real party in interest.

243     *CRIMINAL CONSPIRACY AND THEFT*

244     Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

245     a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of

246     negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

247     acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

248     Petitioner by Lender, which were then used to fund the improper payment of commission fees to

249     Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

250     *AGENT PRACTICED UP-SELLING*

251     By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.   In so

252     doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

253     that Agent was licensed by the state.   Agent further defrauded Petitioner by failing to disclose

254     Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to

255     Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

256     connivances, wherein Agent proactively made knowingly false and misleading statements of

257     alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

258     Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

259     a loan product offered by the Lender.   Said loan product was more expensive than Petitioner

260     could legally afford. Agent acted with full knowledge that Petitioner would have made a

261     different decision had Agent given complete disclosure.

ORIGINAL PETITION                                      

262 ### *FRAUDULENT INDUCEMENT*

263 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
264 known, Petitioner could not afford in order to unjustly enrich Lender.

265 ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

266 Said more expensive loan product was calculated to produce a higher return when sold as a
267 security to an investor who was already waiting to purchase the loan as soon as it could be
268 consummated.

269 #### **Extra Commission for Late Payments**

270 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
271 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
272 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
273 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
274 Thereby, the Lender stands to receive more than double the regular commission on collections if
275 the borrower pays late.

276 #### **Extra Income for Handling Foreclosure**

277 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
278 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
279 receives considerable funds for handling and executing the foreclosure process.

280 #### **Credit Default Swap Gambling**

281 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
282 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
283 designed the loan to fail, betting on said failure is essentially a sure thing.

284 ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

285 Lender sold the security instrument after closing and received consideration in an amount in
286 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
287 security instrument, Lender separated the lien from said security instrument, creating a fatal and
288 irreparable flaw.

ORIGINAL PETITION

289 When Lender received consideration while still holding the lien and said consideration was in
290 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
291 could not gain standing to enforce the lien. The lien was, thereby, rendered void.

292 Since the separation of the lien from the security instrument creates such a considerable concern,
293 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
294 security instrument?"

295 When you follow the money the answer is clear. The Lender will hold the lien for three years,
296 then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
297 the full amount from Lender's tax liability, thereby, receiving consideration a second time.

298 Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
299 lien to the holder of the security, however, the lien once satisfied, does not gain authority just
300 because the holder, after receiving consideration, decides to transfer it to someone else.

301 ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

302 Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
303 information that Lender had as a result of creating the faulty loans sure to default. Lender was
304 then free to invest on the bet that said loan would default and stood to receive unjust enrichment
305 a third time. This credit default swap derivative market scheme is almost totally responsible for
306 the stock market disaster we now experience as it was responsible for the stock market crash in
307 1907.

308 ***LENDER CHARGED FALSE FEES***

309 Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
310 Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
311 vendor.

312 Lender charged other fees that were a normal part of doing business and should have been
313 included in the finance charge.

314 Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
315 did Lender or Trustee provide documentation to show that the fees herein listed were valid,
316 necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION                                                11 of 25

| | | |
|---|---|---:|
| 804 | Credit Report Fee | $18.50 |
| 808 | Underwriting Fee | $515.00 |
| 809 | Flood Certification Fee | $12.00 |
| 810 | Tax Service Fee | $65.00 |
| 811 | Processing Fee | $350.00 |
| 812 | Broker Fee | $2,196.00 |
| 813 | Funding Fee | $50.00 |
| 901 | Interest | $104.20 |
| 1001 | Hazard Insurance | $804.40 |
| 1004 | County Property Taxes | $521.52 |
| 1103 | Title Exam Fee | $450.00 |
| 1108 | Title Insurance | $295.00 |
| 1111 | Premium Tax | $14.75 |
| 1112 | Courier Fee | $20.00 |
| 1201 | Recording Fee | $28.00 |

317   Debtor is unable to determine whether or not the above fees are valid in accordance with the
318   restrictions provided by the various consumer protection laws.   Therefore, please provide; a
319   complete billing from each vendor who provided the above listed services; the complete contact
320   information for each vendor who provided a billed service; clearly stipulate as to the specific
321   service performed; a showing that said service was necessary; a showing that the cost of said
322   service is reasonable; a showing of why said service is not a regular cost of doing business that
323   should rightly be included in the finance charge.

324   The above charges are hereby disputed and deemed unreasonable until such time as said charges
325   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
326   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

327   In the event lender fails to properly document the above charges, borrower will consider same as
328   false charges.  The effect of the above amounts that borrower would pay over the life of the note
329   will be an overpayment of $83,311.06  This amount will be reduced by the amount of items
330   above when said items are fully documented.

331   ***RESPA PENALTY***

332   From a cursory examination of the records, with the few available, the apparent RESPA
333   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
334   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
335   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
336   No 1st Payment Letter.

ORIGINAL PETITION                                                                                 12 of 25

337  The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
338 Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
339 statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
340 disclosure letter; loan discount fee disclosure; business insurance company arrangement
341 disclosure; notice of right to rescind.

342 The courts have held that the borrower does not have to show harm to claim a violation of the
343 Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
344 in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
345 no more than two thousand, considering the large number enumerated here, it is reasonable to
346 consider that the court will assess the maximum amount for each violation.

347 Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
348 the note, borrower has calculated that, the number of violations found in a cursory examination
349 of the note, if deducted from the principal, would result in an overpayment on the part of the
350 borrower, over the life of the note, of $186,071.25.

351 If the violation penalty amounts for each of the unsupported fees listed above are included, the
352 amount by which the borrower would be defrauded is $202,045.71

353 Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
354 variance, it appears that lender intended to defraud borrower in the amount of $471,428.02

355 ***LENDER CONSPIRED WITH APPRAISER***

356 Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
357 purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
358 duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
359 inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
360 Petitioner.

361 ***LENDER CONSPIRED WITH TRUSTEE***

362 Lender conspired with the trust Agent at closing to create a condition of stress for the specific
363 purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
364 fully understand what was being signed.

ORIGINAL PETITION         13 of 25

365  The above referenced closing procedure was a carefully crafted connivance, designed and
366  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
367  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
368  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
369  as required by various consumer protection statutes.

370  ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

371  In the manner in which Defendants have carried on their business enterprises, they have engaged
372  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
373  (Deceptive Practices Act).

374  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
375  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
376  detriment in an amount to be shown according to proof at trial of this matter.

377  ### *EQUITABLE TOLLING FOR TILA AND RESPA*

378  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
379  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

380  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
381  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
382  are subject to a one-year limitations period; however, such claims are subject to the equitable
383  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
384  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
385  that given the remedial purpose of TILA, the limitations period should run from the date of
386  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
387  circumstances, suspend the limitations period until the borrower discovers or has reasonable
388  opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
389  *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

390  Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
391  anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
392  that such limitations period may be equitably tolled. The Court of Appeals for the District of
393  Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

394 *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
395 opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
396 *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
397 that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
398 *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
399 *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
400 interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
401 language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
402 of precedential value, this Court has previously found both the TILA and **RESPA** limitations
403 periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
404 *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

405 The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
406 by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
407 existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
408 *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
409 Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
410 any wrongful conduct by the Defendants. Santa Maria. at 1178.

### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING STANDARDS*

413 Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
414 assets by, for example, providing W-2 statements, tax returns, bank statements, documents
415 evidencing title, employment information, and other information and documentation that could
416 be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
417 ability to repay a particular loan over both the short and long term. Defendants deviated from and
418 disregarded these standards, particularly with regard to its riskier and more profitable loan
419 products.

#### Low-Documentation/No-Documentation Loans.

421 Driven by its desire for market share and a perceived need to maintain competitiveness with the
422 likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
423 documentation loan products, including the HARMs and HELOCs described hereinabove, and
424 began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

ORIGINAL PETITION                                                              15 of 25

425   the already eased underwriting standards to the point of disregarding such standards. This
426   quickened the loan origination process, allowing for the generation of more and more loans
427   which could then be resold and/or securitized in the secondary market.

428   Defendants marketed no-documentation/low-documentation loan programs that included
429   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
430   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
431   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
432   was to be roughly consistent with incomes in the types of jobs in which the borrower was
433   employed. When borrowers were requested to document their income, they were able to do so
434   through information that was less reliable than in a full-documentation loan.

435   For stated income loans, it became standard practice for loan processors, loan officers and
436   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
437   income loans, emphasizing loan origination from a profitability standpoint at the expense of
438   determining the ability of the borrower to repay the loan from an underwriting standpoint,
439   encouraged the overstating and/or fabrication of income.

440   **Easing of Underwriting Standards**

441   In order to produce more loans that could be resold in the secondary mortgage market,
442   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
443   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
444   the base FICO score needed for a SISA loan.

445   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
446   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
447   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
448   income ratios (the amount of monthly income compared to monthly debt service payments and
449   other monthly payment obligations.

450   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
451   term financial circumstances, approving the loan based on the initial fixed rate without taking
452   into account whether the borrower could afford the substantially higher payment that would
453   inevitably be required during the remaining term of the loan.

ORIGINAL PETITION                                                        16 of 25

454   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
455   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
456   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
457   interest payments.

458   As Defendants pushed to expand market share, they eased other basic underwriting standards.
459   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
460   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. <u>At the same time that they</u>
461   <u>eased underwriting standards the Defendants also were encouraging consumers to go further into</u>
462   <u>debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed</u>
463   <u>underwriting standards created the aftermarket supply they needed. As a result, the Defendants</u>
464   <u>made it easy for the unwary consumer to take on more debt than he could afford by encouraging</u>
465   <u>unsound financial practices, all the while knowing defaults would occur more and more</u>
466   <u>frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting</u>
467   <u>standards.</u>

468   Defendants knew, or in the exercise of reasonable care should have known, from its own
469   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
470   loans that were likely to end up in default. However, as the pressure mounted to increase market
471   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
472   underwriting guidelines. Such was the environment that loan officers and underwriters were,
473   from time to time, placed in the position of having to justify why they did not approve a loan that
474   failed to meet underwriting criteria.

475   **Risk Layering**

476   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
477   loans with one or more relaxed underwriting standards.

478   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
479   would increase the likelihood of default. Among the risk layering Defendants engaged in were
480   approving HARM loans with little to no down payment, little to no documentation, and high
481   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
482   the loans it promoted to borrowers.

483   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
484   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
485   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
486   business ignored basic established underwriting standards and acted to mislead the borrower, all
487   to the detriment of the borrower and the consumer of loan products..

488   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
489   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
490   business practices described above in paragraphs 30-42 of this Complaint

491       ***UNJUST ENRICHMENT***

492   Petitioner is informed and believes that each and all of the Defendants received a benefit at
493   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
494   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
495   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
496   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
497   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
498   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
499   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
500   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

501   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
502   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
503   deprived, and is entitled to restitution in the amount of $471,428.02

504       ***CLAIM TO QUIET TITLE.***

505   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
506   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
507   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
508   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

509   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
510   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
511   interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION

512   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

513   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

514   "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

515   scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

516   *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

517   *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

518   *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

519   *Rptr. 2d 752 (2d Dist. 1995).*

520   ### SUFFICIENCY OF PLEADING

521   Petitioner has sufficiently pled that relief can be granted on each and every one of the

522   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

523   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

524   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

525   allegations of material fact in the complaint are taken as true and construed in the light most

526   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

527   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

528   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

529   theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*

530   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

531   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

532   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,

533   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

534   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

535   relief as requested herein should be granted.

536   ### CAUSES OF ACTION

537   ### BREACH OF FIDUCIARY DUTY

538   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary

539   duty of care with respect to the mortgage loan transactions and related title activities involving

540   the Trust Property.

ORIGINAL PETITION

541 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
542 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
543 all applicable laws governing the loan transactions in which they were involved, including but
544 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

545 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
546 economic harm and detriment to Petitioner(s).

547 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
548 all to be shown according to proof at trial of this matter.

549 ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

550 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
551 duty to properly perform due diligence as to the loans and related transactional issues described
552 hereinabove.

553 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
554 X and Z promulgated there under to, among other things, provide proper disclosures concerning
555 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
556 or should have known that borrowers could not afford or maintain, and to avoid paying undue
557 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

558 Defendants knew or in the exercise of reasonable care should have known, that the loan
559 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
560 violative of federal and state laws and regulations, and would subject Petitioner to economic and
561 non-economic harm and other detriment.

562 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
563 Z promulgated there under were intended and designed to protect, and the conduct alleged
564 against Defendants is the type of conduct and harm which the referenced statutes and regulations
565 were designed to deter.

566 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
567 non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION

568    *AGENT: COMMON LAW FRAUD*

569   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
570   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
571   ground for believing them to be true.

572   Agents made these representations with the intention of inducing Petitioner to act in reliance on
573   these representations in the manner hereafter alleged, or with the expectation that Petitioner
574   would so act.

575   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
576   in their negligent misrepresentation, and that various Agents were negligent in not implementing
577   procedures such as underwriting standards oversight that would have prevented various Agents
578   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
579   Defendants.

580   Petitioner is informed and believes that Agent acted in concert and collusion with others named
581   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
582   knowledge or understanding of the terms thereof.

583   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
584   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
585   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
586   proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
587   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
588   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
589   at trial.

590   *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
591   *COVENANT OF GOOD FAITH AND FAIR DEALING.*

592   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
593   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
594   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
595   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

ORIGINAL PETITION

596   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
597   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

598   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
599   particular significance, in part because of the special relationship between the insurer and the
600   insured. The insurer, when determining whether to settle a claim, must give at least as much
601   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
602   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

603   Likewise, there is a special relationship between an Agent and borrower. "A person who
604   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
605   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
606   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
607   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
608   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
609   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
610   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
611   [*Emphasis Added*].

612   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
613   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
614   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
615   product without regard for other more affordable products; (4) Placed Petitioner into a loan
616   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
617   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
618   valid and /or properly documented substitutions and assignments so that Petitioner could
619   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
620   request for documentation of the servicing of Petitioner's loan and the existence and content of
621   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
622   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
623   right under an alleged power of sale because the purported assignment was not recorded and by
624   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
625   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
626   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

627  ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
628  ***SEQ***

629  Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
630  contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
631  Action as though the same were set forth herein.

632  Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
633  the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
634  Property, and entitles Petitioner to damages as proven at trial.

635  ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

636  The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
637  highly leveraged and vulnerable consumers who placed their faith and trust in the superior
638  knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
639  civilized society.

640  Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
641  distress, or acted in conscious and/or reckless disregard of the probability that such distress
642  would occur.

643  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
644  conduct of Defendants as described hereinabove.

645  As a result of such severe emotional distress, Petitioner suffered economic and non economic
646  harm and detriment, all to be shown according to proof at trial of this matter.

647  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
648  Petitioner and secure to Petitioner quite title;

649  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
650  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
651  calculated by Defendants and verified to Petitioner;

652  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
653  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
654  equal to $1,414,284.06

ORIGINAL PETITION

## PRAYER

WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them, as follows:

For an emergency restraining order enjoining lender and any successor in interest from foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth herein;

For a permanent injunction enjoining Defendants from engaging in the fraudulent, deceptive, predatory and negligent acts and practices alleged herein;

For quiet title to Property;

For rescission of the loan contract and restitution by Defendants to Petitioner according to proof at trial;

For disgorgement of all amounts wrongfully acquired by Defendants according to proof at trial;

For actual monetary damages in the amount $471,428.02;

For pain and suffering due to extreme mental anguish in an amount to be determined at trial.

For pre-judgment and post-judgment interest according to proof at trial;

For punitive damages according to proof at trial in an amount equal to $1,414,284.06.

For attorney's fees and costs as provided by statute; and,

For such other relief as the Court deems just and proper.

Respectfully Submitted,

_Robert M. Cain_
**Robert Cain**

690 Robert & Donna Cain
691 3155 Old Mill Rd.
692 Brandenburg, Ky.40108
693 ( 270 ) 284 − 4025 / **rm1cain@gmail.com**

694 ### UNITED STATES DISTRICT COURT

695 ### KENTUCKY WESTERN DISTRICT COURT
696 ### ( MAIN OFFICE )

**ROBERT CAIN**

Plaintiff,

Case # _____

**DEMAND FOR JURY TRIAL**

vs.

**AMERICAN HOME MORTGAGE SERVICING**

Date: _____

Defendant

697 ### PLAINTIFF'S DEMAND FOR JURY TRIAL

698 Plaintiff, Robert Cain asserts his rights under the Seventh Amendment to the U.S.

699 Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury

700 on all issues.

701 Respectfully Submitted,

702
703 *Robert Cain*
704 **Robert Cain**

ORIGINAL PETITION